******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# SAIFULLAH KHAN *v.* YALE UNIVERSITY ET AL.
## (SC 20705)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Keller, Js.

*Syllabus*

The plaintiff, who was an undergraduate student at Yale College, sought to recover damages in the United States District Court for the District of Connecticut in connection with statements the defendant D, a classmate of the plaintiff, made during a disciplinary hearing conducted by the named defendant university's committee on sexual misconduct (committee). In 2015, D accused the plaintiff of sexually assaulting her in her dormitory, and the university suspended the plaintiff. The committee, however, stayed the disciplinary proceedings against the plaintiff pending the outcome of a criminal case that the state had filed against him. The plaintiff subsequently was acquitted on multiple counts of sexual assault, and, in 2018, he resumed full-time student status at Yale. Shortly thereafter, however, as a result of the reporting in a student newspaper of additional allegations of sexual assault involving the plaintiff, the plaintiff agreed to undergo a mental health consultation, but he refused a request that he meet with university administrators. Subsequently, the university again suspended the plaintiff on the ground that it was necessary for the safety and well-being of the plaintiff and the university community. Thereafter, the committee convened a hearing in connection with D's 2015 sexual assault complaint. At the hearing, D, who had since graduated, provided a statement via teleconference, but she did not testify under oath or provide any sworn statement. The plaintiff and his counsel were not permitted in the hearing room when the hearing panel questioned D and, instead, listened to an audio feed from an anteroom. The plaintiff's counsel was not permitted to speak, question D or any other witness, or raise objections, and the hearing panel denied the plaintiff's request for a recording or transcript of the hearing. Additionally, the committee's procedures allowed the parties to submit questions that they wanted the hearing panel to ask and to request that the panel call witnesses to testify, but the panel had the sole discretion to reject the proposed questions or witnesses. The university ultimately expelled the plaintiff. In his complaint filed in the District Court, the plaintiff alleged, inter alia, defamation and tortious interference with business relations as to D in connection with the sexual assault allegations that she had made during the disciplinary proceedings. He also alleged that D had made false accusations in an effort to have him expelled as part of the #MeToo political movement and a personal vendetta stemming from D's alleged romantic advances toward the plaintiff. The District Court, however, granted D's motion to dismiss the plaintiff's claims, concluding that the disciplinary proceedings were quasi-judicial in nature and that D, therefore, enjoyed absolute immunity under Connecticut law for any statements that she had made in the course of those proceedings. The plaintiff appealed from the District Court's granting of D's motion to dismiss to the United States Court of Appeals for the Second Circuit, which concluded that the outcome of the plaintiff's appeal depended on whether the absolute immunity afforded in connection with quasi-judicial proceedings extends to proceedings of nongovernmental entities and certified certain questions to this court regarding the requirements that must be satisfied for a proceeding to be deemed quasi-judicial for the purpose of affording absolute immunity to proceeding participants, whether the disciplinary proceedings at issue properly were recognized as quasi-judicial, and, if not, whether Connecticut law extends qualified immunity to D for statements that she had made during the disciplinary proceedings. *Held*:

1. This court addressed the requirements that must be satisfied for an adjudicative proceeding to be recognized as quasi-judicial:

   a. A proceeding is quasi-judicial for the purpose of affording its participants absolute immunity when the proceeding is specifically authorized

by law, the entity conducting the proceeding applies law to fact in an adjudicatory manner, the proceeding contains adequate procedural safeguards, and there is a public policy justification for encouraging absolute immunity for proceeding participants:

A review of this court's case law revealed that a threshold requirement of any quasi-judicial proceeding is that the proceeding must be specifically authorized by law, meaning that the proceeding is governed by or conducted pursuant to a state or federal statute, and that requirement was consistent with the purposes of absolute immunity insofar as the imposition of absolute immunity is intended to be a public benefit and a societal necessity, and a proceeding that is not specifically authorized by or conducted pursuant to law provides little foundation for a court to determine that the public has an interest in encouraging participation and unfettered candor in the proceeding.

Moreover, in *Priore* v. *Haig* (344 Conn. 636), which was decided after the Second Circuit certified questions to this court, this court explained that a quasi-judicial proceeding is one in which the entity conducting the proceeding has the power of discretion in applying the law to the facts within a framework that contains procedural protections against defamatory statements, and that courts charged with determining whether a proceeding is quasi-judicial in nature may consider, in addition to the six factors set forth in *Kelley* v. *Bonney* (221 Conn. 549), any other factors that are relevant to the particular proceeding, including whether there are procedural safeguards in place to ensure the reliability of the information presented at the proceeding and the authority of the entity to regulate the proceeding, and courts must carefully scrutinize whether there is a sound public policy justification for affording absolute immunity in any given context.

b. With respect to the law to fact requirement, the entity conducting the proceeding must apply some form of public law, rather than its own internal policies, to facts in rendering an adjudicatory decision:

The public law that the entity applies may be constitutional, statutory, administrative, municipal, or common law, so long as it is promulgated by a public official or entity, and the application of the law must either be subject to judicial review or to alteration or repeal by a public official or entity.

Accordingly, although a private entity may adopt publicly created law to govern its affairs, the law applied must be controlled and formulated by the public and be designed to benefit the greater public, and, when an entity creates and applies only its own internal policies, there is a lack of the necessary components of public participation and approval to characterize its proceedings as quasi-judicial for the purpose of affording participants absolute immunity.

c. A quasi-judicial proceeding, for the purpose of affording absolute immunity, requires sufficient procedural safeguards to ensure reliability and to promote fundamental fairness, and, the more robust the safeguards, the more likely the proceeding will be deemed quasi-judicial:

This court reviewed its case law, especially *Priore*, and identified various procedural safeguards that it has considered in determining whether a proceeding is quasi-judicial, including whether the declarant testifies under oath or certifies to the truth of his or her statements, whether there is an opportunity to cross-examine witnesses or to hold declarants accountable for false or misleading statements, whether the accused individual received notice, whether there is a right to appeal the adjudicator's decision, and, relatedly, whether there is an adequate record of the proceeding.

d. In determining whether a proceeding is quasi-judicial, a court should consider the factors enumerated in *Kelley*, but it need not conclude that they are dispositive:

The *Kelley* factors, which concern the various powers of the entity conducting the proceeding and which were intended to assist in the determination of whether a proceeding is quasi-judicial in nature, are not exclusive and supplement and function in addition to the other procedural safeguards that this court identified in *Priore*.

e. In determining whether a proceeding is quasi-judicial, a court must

always carefully scrutinize whether there is a sound public policy justification for the application of absolute immunity in any particular context:

Courts should consider public policy, and the attendant balancing of the public interest of encouraging public participation with the private interest of protecting individuals from false and malicious statements, in addition to the law to fact requirement and the *Kelley* factors, such that, even if an entity applies law to facts in a proceeding with adequate procedural safeguards, the proceeding should not be deemed quasi-judicial for purposes of conferring absolute immunity on its participants if there is no discernable public policy supporting absolute immunity for those participants.

2. The disciplinary proceeding at issue was not quasi-judicial for the purpose of affording absolute immunity to D's statements because it lacked sufficient procedural safeguards necessary to ensure the reliability of the information presented:

a. As a threshold matter, this court recognized that the disciplinary proceeding was specifically authorized by statute (§ 10a-55m (b)), pursuant to which each institution of higher education in Connecticut is required to adopt policies regarding sexual assault, including policies providing for an investigation and disciplinary proceedings for allegations of sexual violence, and policies requiring that, if a disciplinary hearing is held, certain procedures be followed.

b. Nonetheless, even if this court assumed that the hearing panel that conducted the plaintiff's disciplinary proceeding satisfied the law to fact requirement, the collective absence of certain features during the proceeding led this court to conclude that the proceeding did not have adequate safeguards to ensure reliability and promote fundamental fairness:

D did not testify under oath or certify to the truth of her statements, she could not have been disciplined for failing to testify truthfully because she had graduated from Yale before the hearing, and those shortcomings undermined the reliability of D's statements in view of how fundamental the oath requirement is to the reliability of the information presented.

The committee's procedures, which vested the hearing panel with discretion to ask the questions submitted by the plaintiff, did not afford the plaintiff or his counsel a meaningful opportunity to cross-examine or otherwise to confront D in real time, there was nothing in the record to indicate that the hearing panel varied from its procedures in a manner that afforded the plaintiff fundamental fairness, those procedures hampered the plaintiff's ability to ask legitimate questions or sequence questions in a way that he believed would have tested the veracity of D's testimony, and, in view of the importance that the opportunity to meaningfully cross-examine adverse witnesses has to the truth-seeking function of any judicial or quasi-judicial proceeding, the plaintiff was denied a fundamental procedural protection inherent in such proceedings.

Likewise, the committee's procedures did not afford the parties a reasonable opportunity to call witnesses, insofar as the parties could not independently call a witness but were required to submit names to the hearing panel, which had the sole discretion to decide whether to call those proposed witnesses for questioning, and, therefore, failed to comport with the protections typical of quasi-judicial proceedings.

Moreover, although the plaintiff was accompanied by counsel at the disciplinary hearing, the committee's procedures prohibiting counsel from submitting documents or arguing on the plaintiff's behalf, raising objections, or participating in the questioning of witnesses materially limited the assistance of counsel to the point that counsel was effectively rendered irrelevant, and those restrictions, although not dispositive, also supported the conclusion that the disciplinary proceeding was not quasi-judicial.

Furthermore, there was no adequate record of the proceeding because the committee's procedures did not require the keeping of record statements, testimony, or questions, the hearing panel specifically denied the plaintiff's request that it make a transcript or other electronic recording of the hearing for the purpose of further review, the plaintiff's ability to appeal was severely constrained by the lack of a transcript or recording,

and the restriction was especially prejudicial in light of the fact that the plaintiff's counsel was not permitted to object when members of the hearing panel allegedly assumed facts not in evidence or otherwise violated core evidentiary principles.

3. A qualified, rather than an absolute, privilege is available to alleged victims of sexual assault who report their abuse to proper authorities at institutions of higher education, but the allegations of malice in the plaintiff's complaint were sufficient to defeat D's entitlement to qualified immunity as a matter of law at the motion to dismiss stage of the proceeding:

a. The public policy of this state, as articulated in § 10a-55m, supported a qualified privilege for statements made by alleged victims of sexual assault to proper authorities at institutions of higher education:

The legislature had responded aggressively to address concerns surrounding the issue of hesitation by victims to report sexual misconduct on college campuses when it enacted a series of measures reflecting a strong public commitment to protecting such victims, those measures served to encourage alleged victims to report claims of sexual violence and to enable them to obtain justice with dignity and privacy, and, in view of the legitimate public interests articulated by the legislature, it was appropriate to afford a qualified privilege to the statements of alleged victims of sexual assault who report their abuse to proper authorities at institutions of higher education.

b. Accepting the factual allegations in the plaintiff's complaint as true and drawing all inferences in the plaintiff's favor, as the court was required to do at the motion to dismiss stage, this court concluded that the plaintiff alleged sufficient facts to establish that D acted with malice when making the statements at issue so as to defeat D's qualified privilege at this stage of the plaintiff's federal action:

The plaintiff alleged in his complaint that D had made romantic advances toward him, that she initially told a campus health care worker that she had engaged in consensual unprotected sex, that she reported a sexual assault only because she was ashamed of her sexual advances, and that she was encouraged by the larger political movement waged against the plaintiff, and, on the basis of those allegations, a reasonable inference could be drawn that D knowingly fabricated claims of sexual assault against the plaintiff.

Nevertheless, this court observed that a more complete factual record could warrant revisiting the issue of D's qualified privilege at a later stage of the proceedings, such as at the summary judgment stage or if and when the case is submitted to the jury.

Argued October 3, 2022—officially released June 27, 2023

*Procedural History*

Action to recover damages for, inter alia, defamation, and for other relief, brought to the United States District Court for the District of Connecticut, where the court, *Dooley, J.*, granted the motion to dismiss filed by the defendant Jane Doe and rendered partial judgment thereon, from which the plaintiff appealed to the United States Court of Appeals for the Second Circuit, which certified certain questions of law to this court.

*Norman A. Pattis*, with whom, on the brief, was *Cameron L. Atkinson*, for the appellant (plaintiff).

*James M. Sconzo*, with whom was *Brendan N. Gooley*, for the appellee (defendant Jane Doe).

*Jennifer M. Becker* filed a brief for Legal Momentum et al. as amici curiae.

*Opinion*

MULLINS, J. This case arises from disciplinary proceedings conducted in 2018 by the University-Wide Committee on Sexual Misconduct (UWC) of the named defendant, Yale University (Yale). In those proceedings, the defendant Jane Doe[1] accused another student, the plaintiff, Saifullah Khan, of sexual assault in violation of Yale's sexual misconduct policy, resulting in his expulsion from Yale. There is no question that, when Doe made those accusations during a criminal trial, an official governmental proceeding with inherent procedural safeguards, she enjoyed absolute immunity in any subsequent civil action challenging her testimony during the criminal proceeding as defamatory.[2] The primary question presented by this appeal, which reaches us in the form of questions of law certified by the United States Court of Appeals for the Second Circuit; see General Statutes § 51-199b (d);[3] is whether Doe should likewise be afforded absolute immunity from suit for her statements made during the UWC proceeding.

As we explain in this opinion, absolute immunity attaches to statements made in judicial or quasi-judicial proceedings. Doe argues that the UWC proceeding is a quasi-judicial proceeding. Therefore, she contends, her statements made therein are entitled to absolute immunity because such immunity furthers the important public policy goal of permitting alleged victims of sexual assault to speak candidly and frankly with university officials without fear of retaliatory lawsuits.

Khan counters that the UWC proceeding is not quasi-judicial because it was neither a governmental proceeding nor a proceeding with sufficient judicial-like procedures to protect against malicious and defamatory statements. Khan asserts that, if absolute immunity is afforded to testimony provided in proceedings such as that conducted by the UWC, individuals who are falsely accused will be left with no recourse or protection against malicious and defamatory allegations.

Both parties' arguments are compelling. Supporting Doe's position, the amici[4] indicate that one in four women, and one in fifteen men, will experience sexual assault while attending college. These victims are often reluctant to report such crimes. In one survey, for example, college men and women identified these concerns as affecting their decision to report sexual assaults: (1) "shame, guilt, embarrassment," and "not wanting friends and family to know," (2) "concerns about confidentiality," and (3) "fear of not being believed . . . ." *Doe* v. *Roe*, 295 F. Supp. 3d 664, 676 (E.D. Va. 2018).[5] We are mindful of these concerns and sensitive to the need to encourage alleged victims of sexual assault to report their abuse to the appropriate authority at any institution of higher education, free from fear of intimidation and retribution. More generally, we consider it

foundational that all students must be able to attend school, move about campus, and enjoy the manifold privileges and benefits of their academic pursuits without fear of sexual harassment or assault by members of their own community. It is difficult to think of a right more fundamental than the right to physical safety. Indeed, the public policy of this state, established through General Statutes § 10a-55m,[6] demonstrates that sexual assault at institutions of higher education must be addressed by encouraging and supporting alleged victims of sexual assault to speak out, to vindicate their rights, and to bring the perpetrators to justice if the allegations are proven. Likewise, the remedial powers of our judicial system must not be used as a means of intimidation to enable the perpetrators of sexual assault to silence their accusers by using the threat of civil litigation and liability for damages.

At the same time, however, we must recognize a competing public policy that those accused of crimes, especially as serious a crime as sexual assault, are entitled to fundamental fairness before being labeled a sexual predator. Statements made in sexual misconduct disciplinary proceedings that are offered and accepted without adequate procedural safeguards carry too great a risk of unfair or unreliable outcomes. There is no benefit to society or the administration of fair and impartial disciplinary hearings in granting absolute immunity to those who make intentionally false and malicious accusations of sexual assault.[7] Those accused of sexual assault in the higher education context often face life altering and stigmatizing consequences, including suspension or expulsion, criminal referrals, lack or revocation of employment offers, loss of future academic opportunity, and deportation. In the face of these consequences, we must acknowledge that the accused's right to fundamental fairness is no less important than the right of the accuser or the larger community to achieve justice. Disciplinary proceedings that lack fundamental procedural safeguards "do not adequately protect a critical public policy undergirding the doctrine of absolute immunity—to encourage robust participation and candor in judicial and quasi-judicial proceedings while providing some deterrent against malicious falsehoods." *Priore* v. *Haig*, 344 Conn. 636, 651, 280 A.3d 402 (2022).

To balance and protect both of the aforementioned interests, we must clarify when a proceeding is quasi-judicial for the purpose of affording proceeding participants absolute immunity. As we explain hereinafter, we recognize a proceeding as quasi-judicial only when the proceeding at issue is specifically authorized by law, applies law to fact in an adjudicatory manner, contains adequate procedural safeguards, and is supported by a public policy encouraging absolute immunity for proceeding participants. In short, we accept the Second Circuit's invitation to clarify the scope of Connecticut's absolute immunity doctrine and conclude that the UWC

proceeding did not meet the conditions necessary to be considered quasi-judicial. Consequently, Doe is not entitled to absolute immunity.

Nevertheless, because the public interest in encouraging the reporting of sexual assaults to the proper authorities at institutions of higher education is sufficiently compelling to warrant protection of a defamatory statement, a qualified privilege is appropriate for alleged victims of sexual assault in this context. Because this matter is only at the motion to dismiss stage, however, we must accept as true Khan's factual allegations in his complaint that Doe's statements were made with malice, which defeats Doe's asserted privilege at this stage of the proceedings. At a later stage of the proceedings, with a more complete factual record, it may be appropriate to revisit whether Doe's qualified privilege has been defeated.

I

Khan brought the underlying action in the United States District Court for the District of Connecticut, alleging, among other things, defamation and tortious interference with business relationships against Doe.[8] *Khan* v. *Yale University*, 511 F. Supp. 3d 213, 216, 219 (D. Conn. 2021). The District Court's memorandum of decision contains the following factual allegations, taken from Khan's complaint, which we are required to accept as true and construe in Khan's favor for purposes of answering the certified questions of law.[9] See, e.g., *Littlejohn* v. *New York*, 795 F.3d 297, 306 (2d Cir. 2015) (on motion to dismiss pursuant to rule 12 (b) (6) of Federal Rules of Civil Procedure, court must accept complaint's factual allegations as true and draw inferences in plaintiff's favor); *Lunardini* v. *Massachusetts Mutual Life Ins. Co.*, 696 F. Supp. 2d 149, 155 (D. Conn. 2010) ("[a] motion to dismiss under [r]ule 12 (b) (6) must be decided on facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference" (internal quotation marks omitted)), quoting *Leonard F.* v. *Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999).

"Khan is a [foreign national] who at all relevant times was enrolled as an undergraduate student at Yale. . . . [In the fall of 2012, he enrolled as an undergraduate at Yale.] He was expected to graduate Yale with the [c]lass of 2016. . . .

"[Doe] was a classmate of . . . Khan's and was likewise enrolled at all relevant times as an undergraduate student at Yale. . . . On Halloween night in 2015 . . . Khan and . . . Doe, who were familiar with one another from prior campus encounters, met at an [off campus] Halloween party before attending a musical performance at [Yale's] Woolsey Hall. . . . Doe was not feeling well and so the two left the performance

early and walked on campus together before returning to Trumbull College, [a Yale residential college] where they both resided. . . . After . . . Khan escorted . . . Doe to her room, she asked him to [enter] and the two . . . engaged in consensual sexual intercourse. . . . In the morning . . . Doe reported to friends that she had been raped, though she informed a health care worker that she had engaged in unprotected consensual sex when [she sought] contraception at the Yale [H]ealth [C]enter [later] that same day. . . .

"In the days that followed . . . Doe went public with her rape claim and issued a formal complaint against . . . Khan on the advice of the Yale Women's Center. . . . Khan was immediately suspended by Yale [College][10] Deputy Dean Joe Gordon based on . . . Doe's written complaint alone and was ordered to vacate campus, which rendered him homeless. . . . The Yale Police Department opened an investigation and by mid-November [of 2015] the [s]tate . . . filed criminal charges against . . . Khan for [first degree] sexual assault. . . . In the meantime [the UWC] . . . [stayed] any disciplinary proceedings pending the outcome of the prosecution. . . . Khan subsequently faced trial before a jury in early 2018 for first, second, third, and [fourth degree] sexual assault during a nearly [two week] trial and was acquitted on all counts after less than [one] day of deliberations. . . .

"Following his acquittal . . . Khan sought readmission [to] Yale, to which #MeToo activists galvanized an opposition, generating more than 77,000 signatures on a petition protesting his reenrollment. . . . Khan was eventually readmitted and resumed full-time student status in the fall of 2018, though he was denied [on campus] housing and treated as unwelcome[d] on campus. . . . In early October 2018, the Yale Daily News published an article relaying the allegations of a troubled young man who claimed that he had a romantic relationship with . . . Khan that included an episode in which . . . Khan sexually assaulted him during an act of role-playing with a woman in Washington, D.C., and an instance in which . . . Khan slapped him in the face while the two were together in [Indianapolis, Indiana]. . . . The article did not provide any indication that this young man had any affiliation with Yale or had ever been to the Yale campus. . . .

"Following publication of the article . . . Khan was contacted by members of the Yale Police Department and by two Yale administrators to inquire as to his well-being and to determine whether he needed professional help. . . . Khan agreed to undergo a mental health consultation but reported that he was fine and had not considered harming himself or others. . . . Khan was then asked to meet with Yale administrators and after indicating that he would not do so . . . Khan received a letter informing him that he was suspended [effective]

immediately from Yale College . . . which Dean Marvin Chun described as necessary for [Khan's] physical and emotional safety and well-being and/or the safety and well-being of the university community. . . . Khan was thus barred from campus and prohibited from attending his classes; he was again rendered homeless without warning and informed that he would lose his health care coverage effective November 1, 2018. . . .

"[Khan] alleges that Yale's professed concern with his safety and with the safety of the Yale community [was] not credible, as there [was] no evidence that . . . Khan posed a danger to himself or to anyone else . . . . [Furthermore, Khan completed a psychiatric examination during his suspension, in which the evaluator concluded that Khan posed no threat.] Instead . . . Khan asserts that his suspension was pretextual and arose from a confluence of factors that included his unique history at Yale and the heightened sensibilities surrounding sexual assault claims, which were often credited without investigation or due process at Yale as a function of the university's pervasive #MeToo culture. . . . Following his suspension . . . Khan placed Yale on notice that he intended to seek judicial relief and open an investigation into Yale's alleged Title IX[11] violations in connection with his suspension and with the university's failure to convene a hearing on the claims of . . . Doe . . . . Khan also requested and was denied permission to attend his classes with an escort to address Yale's safety concerns, though Yale had afforded other male students accused of sexual misconduct the ability to complete their degrees off-site. . . .

"In November 2018 . . . Khan was permitted to return to campus for a hearing convened by the UWC on . . . Doe's 2015 sexual assault complaint. . . . Doe, who had since graduated from Yale, was not present and provided a statement via teleconference. . . . Khan was not permitted to be in the room when the UWC [hearing] panel questioned . . . Doe and was instead required to sit in an anteroom where he listened to an [audio feed] of the hearing; as a result . . . Khan [claims that he] was denied an opportunity to confront his accuser. . . . And although . . . Khan had counsel present, his attorney was not permitted to speak, question witnesses, or [raise] objections when panel members assumed facts not in evidence and asked compound questions. . . . A member of [Yale's Office of the General Counsel] was present throughout the proceedings to provide counsel to the UWC panel. . . . Khan also requested a transcript or recording of the hearing, which the panel denied.[12] . . . The UWC panel decided to expel . . . Khan as a result of the hearing, which he contends failed to afford him the basic due process that Title IX demands. . . . As a result of losing his opportunity to complete his Yale education . . . Khan [was] subject to immediate deportation to [his country of citizenship], where he [faced] serious physi-

cal danger due to his family's decision to seek refuge in [another country]."[13] (Citations omitted; footnotes added; footnote altered; footnote omitted; internal quotation marks omitted.) *Khan* v. *Yale University*, supra, 511 F. Supp. 3d 216–18.

The following additional procedural history is relevant. After Khan brought the federal action against Yale, various Yale employees, and Doe, the District Court granted Doe's motion to dismiss Khan's claims of defamation and tortious interference with business relationships. See id., 216, 219, 226, 228; see also footnote 8 of this opinion. Insofar as Khan sued Doe for defamation on the basis of her allegations of sexual assault in the UWC proceeding, the District Court concluded that the UWC proceeding was quasi-judicial in nature, and, therefore, under Connecticut law, Doe enjoyed absolute immunity for statements she made in that proceeding. See *Khan* v. *Yale University*, supra, 511 F. Supp. 3d 226. Although the District Court acknowledged that it was "reluctant to alter the landscape of Connecticut's immunity law" by extending absolute immunity to statements made during the proceedings of a nongovernmental entity—an area it said Connecticut courts have not resolved; id., 224; the court concluded that extending such immunity in the present case was warranted, both as a matter of public policy; id., 225–26; and under the six factor test that this court had used to identify quasi-judicial proceedings in *Kelley* v. *Bonney*, 221 Conn. 549, 567, 606 A.2d 693 (1992). See *Khan* v. *Yale University*, supra, 220–22.

On appeal to the Second Circuit, "Khan argue[d] that the proceedings of [nongovernmental] entities cannot be quasi-judicial and, thus, Doe's accusations of sexual assault in a private university's disciplinary hearing are not shielded by absolute immunity." *Khan* v. *Yale University*, 27 F.4th 805, 810 (2d Cir. 2022). The Second Circuit concluded that the outcome of the appeal hinges on a question of Connecticut state law—namely, whether quasi-judicial immunity extends to proceedings like that of the 2018 Yale UWC proceeding—and that it could not predict how this court would resolve that question. See id., 833. Consequently, the Second Circuit certified the following questions of law, which we modify to address issues of Connecticut law pertinent to this appeal:[14]

(1) What requirements must be satisfied for a proceeding to be recognized as quasi-judicial for purposes of affording absolute immunity to proceeding participants? Specifically:

(a) Must an entity apply controlling law, and not simply its own rules, to the facts at issue in the proceeding? See *Petyan* v. *Ellis*, 200 Conn. 243, 246, 510 A.2d 1337 (1986); see also W. Keeton et al., Prosser and Keeton on the Law of Torts (5th Ed. 1984) § 114, pp. 818–19.

(b) How, if at all, do the power factors enumerated in *Kelley* v. *Bonney*, supra, 221 Conn. 567, and *Craig* v. *Stafford Construction, Inc.*, 271 Conn. 78, 85, 856 A.2d 372 (2004), apply to the identification of a proceeding as quasi-judicial; and, if they do apply, are these factors in addition to; see id.; or independent of, a preliminary law to fact requirement?

(c) How, if at all, does public policy inform the identification of a proceeding as quasi-judicial, and, if it does, is this consideration in addition to, or independent of, a law to fact requirement and the *Kelley/Craig* factors?

(d) How, if at all, do procedures usually associated with traditional judicial proceedings—such as notice and the opportunity to be heard; the ability to be physically present throughout a proceeding; an oath requirement; the ability to call, examine, confront, and cross-examine witnesses; and the ability to be represented by counsel—inform the identification of a proceeding as quasi-judicial? See id., 87–88; *Kelley* v. *Bonney*, supra, 221 Conn. 568–70.[15]

(2) Was the 2018 Yale UWC proceeding at issue in the present appeal properly recognized as quasi-judicial?

(3) If the answer to the second question is yes, would Connecticut extend absolute quasi-judicial immunity to Doe for her statements in the Yale UWC proceeding?

(4) If the answer to the second question is no, would Connecticut afford Doe qualified immunity or no immunity at all? See *Khan* v. *Yale University*, supra, 27 F.4th 833–34.

Although the Second Circuit also asked us to answer whether, under Connecticut law, a proceeding before a nongovernmental entity could *ever* be deemed quasi-judicial for purposes of affording absolute immunity to proceeding participants; id., 833; we conclude that it is unnecessary to answer that question in order to resolve whether Yale's UWC proceeding was quasi-judicial. Instead, we answer the certified questions focusing on the requirements that any proceeding must satisfy to be considered quasi-judicial.

II

We first address what requirements must be satisfied for a proceeding to be recognized as quasi-judicial for purposes of affording absolute immunity to proceeding participants. See id. At the outset, we recognize that "the determination of whether [a proceeding] constitutes a quasi-judicial proceeding is a question of law over which our review is plenary." *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 83. "[W]hether a particular proceeding is quasi-judicial in nature, for the purposes of triggering absolute immunity, will depend on the particular facts and circumstances of each case." (Internal quotation marks omitted.) *Priore* v. *Haig*, supra, 344 Conn. 645.

The doctrine of absolute judicial immunity, or absolute privilege, which shields judges, parties, and witnesses from liability for their testimony in judicial and quasi-judicial proceedings, has its origins in English common law.[16] In Connecticut, we have long held that "communications uttered or published in the course of judicial proceedings are absolutely privileged [as] long as they are in some way pertinent to the subject of the controversy." (Internal quotation marks omitted.) *Gallo* v. *Barile*, 284 Conn. 459, 466, 935 A.2d 103 (2007); see also *Charles W. Blakeslee & Sons* v. *Carroll*, 64 Conn. 223, 232, 29 A. 473 (1894) (*Blakeslee*) (relying on English common law to first recognize privilege), overruled in part on other grounds by *Petyan* v. *Ellis*, 200 Conn. 243, 510 A.2d 1337 (1986).

Our earliest cases recognizing absolute immunity limited the privilege to official adjudicative proceedings, i.e., formal dispute resolution proceedings or forums, that were specifically authorized by law. In *Blakeslee*, for example, this court held that "[a] judicial proceeding within the meaning of the rule as to absolute privilege must . . . be *one carried on in a court of justice established or recognized by law*, [in which] the rights of parties which are recognized and protected by law are involved and may be determined." (Emphasis added.) *Charles W. Blakeslee & Sons* v. *Carroll*, supra, 64 Conn. 234.

Since *Blakeslee*, we have acknowledged that "[t]he judicial proceeding to which [absolute] immunity attaches has not been defined very exactly. [At the very least, it] includes any hearing before a tribunal [that] performs a judicial function, ex parte or otherwise, and whether the hearing is public or not. It includes . . . [competency], bankruptcy, or naturalization proceedings, and an election contest. It extends also to the proceedings of many administrative officers, such as boards and commissions, so far as they have powers of discretion in applying the law to the facts [that] are regarded as judicial or [quasi-judicial], in character."[17] (Internal quotation marks omitted.) *Kelley* v. *Bonney*, supra, 221 Conn. 566; see also *Hopkins* v. *O'Connor*, 282 Conn. 821, 839, 925 A.2d 1030 (2007) (" 'judicial proceeding' has been defined liberally to encompass much more than civil litigation or criminal trials").

Although we have never expressly said so, a review of our case law demonstrates that a threshold requirement of any quasi-judicial proceeding is that the proceeding must be specifically authorized by law, meaning that the proceeding is governed by or conducted pursuant to a state or federal statute.[18] For example, in *Petyan* v. *Ellis*, supra, 200 Conn. 243, General Statutes (Rev. to 1979) §§ 31-241, 31-242 and 31-249 authorized officials of the Employment Security Division of the state Department of Labor to conduct reviews of unemployment compensation claims. See id., 248–49. In *Kelley*

v. *Bonney*, supra, 221 Conn. 549, a state Board of Education's hearing to revoke a teaching certificate was prescribed by General Statutes (Rev. to 1987) § 10-145b (m). See id., 567. In *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 78, a proceeding by the Hartford Police Department was required by the department's official code of conduct, enacted pursuant to both city charter and a collective bargaining agreement in accordance with Connecticut's Municipal Employee Relations Act. See id., 86; see also General Statutes § 7-467 et seq.

Similarly, our appellate courts have recognized that arbitration proceedings, both contractual and court mandated, were specifically authorized by law and qualified as quasi-judicial.[19] See *Larmel* v. *Metro North Commuter Railroad Co.*, 341 Conn. 332, 341, 267 A.3d 162 (2021) ("[court mandated] arbitration proceeding pursuant to [General Statutes] § 52-549u is, undoubtedly, a quasi-judicial examination of the parties' claims, as arbitrators are statutorily authorized to carry out functions that are judicial in nature"); *Preston* v. *O'Rourke*, 74 Conn. App. 301, 310–12, 314–15, 811 A.2d 753 (2002) (arbitration proceeding conducted pursuant to State Employee Relations Act and governed by General Statutes §§ 52-408 through 52-424 was quasi-judicial in nature).

Requiring that a proceeding be specifically authorized by or conducted pursuant to law is consistent with the purposes of absolute immunity because, among other things, the imposition of absolute immunity is intended to be a public benefit and a societal necessity. A proceeding that is not specifically authorized by or conducted pursuant to law provides little foundation for this court to determine that the public has an interest in encouraging participation and unfettered candor in the proceeding. See *Logan's Super Markets, Inc.* v. *McCalla*, 208 Tenn. 68, 72, 343 S.W.2d 892 (1961) ("[absolute immunity] belongs to the public, not to the individual, and the public should not stand to lose the benefit it derives"). Indeed, a proceeding that lacks authorization by law provides no assurance that the public interest in the proceeding is sufficiently vital to justify affording absolute immunity to its participants.

Beyond a specific authorization by law, our decision in *Priore*, which was released after the Second Circuit certified this question, sets forth the general requirements that must be satisfied for any proceeding to be recognized as quasi-judicial: "[A] quasi-judicial proceeding is one in which the entity conducting the proceeding has the power of discretion in applying the law to the facts within a framework that contains procedural protections against defamatory statements. As part of their inquiry into whether a proceeding is truly quasi-judicial, courts may consider the relevant factors enumerated by this court in *Kelley* to determine whether the entity

exercises powers akin to a judicial entity. . . . Courts may also consider other factors that are relevant to a given proceeding, including the procedural safeguards of the proceeding and the authority of the entity to regulate the proceeding. Finally, courts must always carefully scrutinize whether there is a sound public policy justification for the application of absolute immunity in any particular context." (Citation omitted.) *Priore* v. *Haig*, supra, 344 Conn. 652–53. We now discuss in greater detail how each of these requirements applies to adjudicative proceedings, in response to the auxiliary questions posed by the Second Circuit.

A

The Second Circuit asks whether the entity conducting a quasi-judicial proceeding must "apply controlling law, and not simply its own rules, to [the] facts at issue in the proceeding . . . ." *Khan* v. *Yale University*, supra, 27 F.4th 833. We have repeatedly held that "a quasi-judicial proceeding is one in which the entity conducting the proceeding has the power of discretion in applying the law to the facts . . . ." *Priore* v. *Haig*, supra, 344 Conn. 652. Although we have recognized various sources of official law—statutes, regulations, municipal codes—in each case in which we deemed the proceeding at issue to be quasi-judicial, the entity conducting the proceeding applied more than its own internal policies or rules of decision.

The law to fact requirement originated in judicial proceedings and was derived to distinguish proceedings involving mere investigatory powers from proceedings that involved investigation *and* adjudication of the matter.[20] In the nineteenth century, this court determined that a committee proceeding to investigate the truth of certain statements made by the New Haven Board of Aldermen did not constitute a judicial or quasi-judicial proceeding. See *Charles W. Blakeslee & Sons* v. *Carroll*, supra, 64 Conn. 234. The court explained that "the power and the duty of the committee were simply to obtain . . . information . . . . The persons who were to make the inquiry had no judicial character or office . . . had no settled jurisdiction or fixed mode of procedure . . . and they had no judicial function to exercise, for they could decide nothing, and could only report their action to a board [that] might altogether disregard what the committee had done." Id.

Nearly one century later, in *Petyan* v. *Ellis*, supra, 200 Conn. 243, this court clarified that a proceeding can be quasi-judicial if the entity conducting the proceeding "ha[s] powers of discretion in applying the law to the facts . . . ." (Internal quotation marks omitted.) Id., 246. Unlike in *Blakeslee*, the entity conducting the proceeding in *Petyan* "decide[d] the facts and then appl[ied] the appropriate law" to the facts to render a decision. Id., 248. At issue was whether statements provided by a defendant-employer on a " 'fact-finding supplement' "

form of the Employment Security Division of the state Department of Labor were subject to absolute immunity. Id., 247–48. The court concluded that, because, "[i]n the processing of unemployment compensation claims, the administrator, the referee and the [E]mployment [S]ecurity [B]oard of [R]eview decide the facts and then apply the appropriate law . . . [t]he [E]mployment [S]ecurity [D]ivision . . . acts in a quasi-judicial capacity when it acts [on] claims for unemployment compensation." (Citation omitted; footnotes omitted.) Id., 248–49. Specifically, in *Petyan*, the adjudicators were authorized by statute to determine unemployment claims. See id.

Similarly, in *Kelley*, this court placed special emphasis on the Board of Education's duty to apply Connecticut laws and regulations to its findings of fact in order to properly revoke a teaching certificate. See *Kelley* v. *Bonney*, supra, 221 Conn. 567–68. This court observed that the proceedings had to conform to statutory regulations that listed well delineated causes for a teacher's license revocation. Id., 568; see also *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 84–89 (Hartford Police Department applied its official code of conduct and collective bargaining agreement to facts, thus satisfying law to fact requirement).[21]

Most recently, in *Priore* v. *Haig*, supra, 344 Conn. 636, we likewise observed that "the [Greenwich Planning and Zoning Commission] has the discretion to apply the law, [the Greenwich zoning regulations] . . . to the facts set forth in the application before it." Id., 654. We explained that, "when acting in this administrative capacity on a special permit application, a planning and zoning commission . . . decides [whether] all of the standards enumerated in the special permit regulations are met . . . ." (Internal quotation marks omitted.) Id., 653.[22]

A review of our cases thus demonstrates that the entity conducting a quasi-judicial proceeding must apply public law—whether it be constitutional, statutory, administrative, municipal, or common law—to facts for the purpose of rendering an adjudicatory decision. The law that is applied is promulgated by a public official or entity, and the application of the law is either subject to judicial review or may be altered or repealed by a public official or entity. In other words, although a private entity may adopt publicly created law to govern its affairs, the law applied is controlled and formulated by the public and is designed to benefit the greater public. Thus, an entity that creates and applies only its internal policies lacks the necessary components of public participation and approval to be considered quasi-judicial for the purpose of affording participants absolute immunity.

B

We next turn to the question of how "procedures usually associated with traditional judicial proceedings—such as notice and the opportunity to be heard; the ability to be physically present throughout a proceeding; an oath requirement; the ability to call, examine, confront, and cross-examine witnesses; [and] the ability to be represented by counsel—inform the identification of a proceeding as quasi-judicial?" *Khan* v. *Yale University*, supra, 27 F.4th 833. Because the doctrine of absolute immunity has applied to statements made during official judicial proceedings, which feature all of these procedures, the extent to which these procedures are present will often be determinative of whether a proceeding qualifies as quasi-judicial. Our recent decision in *Priore* provides guidance.

In that case, we concluded that, in addition to the law to fact requirement, "our case law also looks to the procedural safeguards that attend to the proceeding . . . which promote reliability and due process, as part of the analysis to determine whether a proceeding is truly quasi-judicial in nature." *Priore* v. *Haig*, supra, 344 Conn. 648–49. We explained that "it [is] eminently reasonable for courts to consider the procedural safeguards attendant to a proceeding because [s]tatements made during proceedings that lack basic [due process] protections generally do not engender fair or reliable outcomes." (Internal quotation marks omitted.) Id., 651.

In *Priore*, we ultimately concluded that statements made during a town planning and zoning commission public hearing were not entitled to absolute immunity. See id., 661, 663. Although the commission applied law to fact and the public hearing satisfied many of the *Kelley* factors; see id., 654, 661; see also part II C of this opinion; we declined to recognize the hearing as quasi-judicial because, among other things, "the hearing before the commission had almost no procedural safeguards in place to ensure the reliability of the information presented at the proceeding." *Priore* v. *Haig*, supra, 344 Conn. 655. Specifically, we identified two significant procedural safeguards that were missing: (1) the declarant did not testify under oath or certify the truth of her statements, and (2) there was no practical opportunity to cross-examine witnesses or to hold declarants accountable for false or misleading statements. See id., 655–57; see also id., 655 n.4.

We explained in *Priore* that it is important for any declarant receiving absolute immunity to make the statements under oath or otherwise certify that the information is true and correct because, without doing so, there is no judicial remedy available to deter a witness from giving false information. See id., 655. This is consistent with a long line of Connecticut cases holding that, for absolute immunity to apply, it is vitally important that statements be sworn, made under oath, or otherwise subject to the penalty of perjury. See, e.g., *Craig*

v. *Stafford Construction, Inc.*, supra, 271 Conn. 87 (emphasizing that "witnesses [gave] sworn statements to the investigator during the investigation, and the form on which they sign[ed] their statement inform[ed] the witness that he or she [could] be criminally liable for filing a false statement"); *Kelley* v. *Bonney*, supra, 221 Conn. 568–69 (relying on fact that "a request for revok[-ing] . . . [a teaching certificate had to be] made under oath"); *DeLaurentis* v. *New Haven*, 220 Conn. 225, 264, 597 A.2d 807 (1991) (holding that, "[although] no civil remedies can guard against lies, the oath and the fear of being charged with perjury are adequate to warrant an absolute privilege for a witness' statements"); *Petyan* v. *Ellis*, supra, 200 Conn. 250–51 (emphasizing that defendant was required to certify that information presented was true and correct and that she could have been summoned to testify under oath, subject to criminal penalties, if she perjured herself); see also *Larmel* v. *Metro North Commuter Railroad Co.*, supra, 341 Conn. 341 (relying on fact that arbitrators are statutorily authorized to administer oaths); *Preston* v. *O'Rourke*, supra, 74 Conn. App. 312 (noting that "witnesses [in contractual arbitration] testified under oath"). Because absolute immunity removes the threat of private defamation actions in order to incentivize witnesses to participate candidly and willingly in the proceeding, it is crucial that there be some strong deterrent, such as the threat of a perjury prosecution, against abuse of the privilege by the giving of untruthful testimony.[23]

The second missing safeguard in *Priore* was the opportunity for parties to meaningfully challenge the veracity of participants' statements, whether through cross-examination or other comparable means. See *Priore* v. *Haig*, supra, 344 Conn. 657. "For two centuries, [common-law] judges and lawyers have regarded the opportunity of cross-examination as an essential safeguard of the accuracy and completeness of testimony." (Internal quotation marks omitted.) *Pagano* v. *Ippoliti*, 245 Conn. 640, 656, 716 A.2d 848 (1998) (*McDonald, J.*, dissenting). It has been said many times that "cross-examination is beyond any doubt the greatest legal engine ever invented for the discovery of truth." (Internal quotation marks omitted.) *State* v. *Ali*, 233 Conn. 403, 424, 660 A.2d 337 (1995). The procedure allows counsel to "expose [testimonial infirmities, such as forgetfulness, confusion, or evasion] . . . thereby calling to the attention of the [fact finder] the reasons for giving scant weight to the witness' testimony." (Internal quotation marks omitted.) *State* v. *Hutton*, 188 Conn. App. 481, 504, 205 A.3d 637 (2019).

It is not surprising, then, that, as we discussed in *Priore*, several of this court's prior cases recognizing quasi-judicial proceedings, including *Hopkins*, *Craig*, and *Kelley*, relied on the respondent's ability to cross-examine adverse witnesses or to otherwise challenge the credibility of witness testimony in quasi-judicial

proceedings. See *Priore* v. *Haig*, supra, 344 Conn. 649–51; see, e.g., *Hopkins* v. *O'Connor*, supra, 282 Conn. 834–37 (patient confined to hospital under emergency certificate had right to cross-examine adverse witnesses); *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 88 (police officer who was under investigation had right to cross-examine adverse witnesses); *Kelley* v. *Bonney*, supra, 221 Conn. 570 n.14 (parties possessed right to cross-examine adverse witnesses); see also, e.g., *Spencer* v. *Klementi*, 136 Nev. 325, 332, 466 P.3d 1241 (2020) ("to qualify as a quasi-judicial proceeding for purposes of the absolute privilege, a proceeding must, at a minimum . . . allow opposing parties to cross-examine, impeach, or otherwise confront a witness"). The failure to provide a mechanism to challenge the veracity of testimony weighs heavily against the conclusion that a proceeding is quasi-judicial.

In addition to these two key procedural protections that were absent from the town planning and zoning commission hearing in *Priore*, this court has frequently relied on the presence of other procedural protections in determining whether a proceeding qualifies as quasi-judicial. One threshold requirement is notice. Indeed, "[t]he essence of due process is the requirement that a person in jeopardy of a serious loss [be given] notice of the case against him and [an] opportunity to meet it." (Internal quotation marks omitted.) *State* v. *Lopez*, 235 Conn. 487, 493, 668 A.2d 360 (1995). Thus, notice to the accused, who may be subjected to serious loss, is an important and necessary procedural safeguard that accompanies any quasi-judicial proceeding. See *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 88 (police officer must be given notice of charges against him and date of formal hearing); *Kelley* v. *Bonney*, supra, 221 Conn. 569 n.14 (teacher is required to be given notice of teaching certificate decertification proceeding); *Preston* v. *O'Rourke*, supra, 74 Conn. App. 310–11 (contractual arbitration proceedings require formal notice to parties).

This court has also stressed the importance of procedures such as the opportunity for parties to call witnesses or otherwise have them subpoenaed, to have the meaningful assistance of counsel during the proceeding, and to appeal on the record of the proceeding. Nearly all the proceedings recognized by this court as quasi-judicial have provided a reasonable opportunity for the decision makers or parties to subpoena or call witnesses. See, e.g., *Larmel* v. *Metro North Commuter Railroad Co.*, supra, 341 Conn. 341 (arbitrator authorized to issue subpoenas pursuant to General Statutes § 52-549w (c)); *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 88 (police department officials had subpoena power and officer being investigated could call witnesses on his or her own behalf at formal hearing); *Kelley* v. *Bonney*, supra, 221 Conn. 570 n.14 (counsel were granted reasonable opportunity to call witnesses); *Petyan* v. *Ellis*, supra, 200 Conn. 251 (officials of Employment Security Division of state

Department of Labor possessed subpoena power); see also *Preston* v. *O'Rourke*, supra, 74 Conn. App. 312 (noting arbitrator's power to subpoena witnesses pursuant to General Statutes § 52-412). Thus, the ability of the entity conducting the proceeding to subpoena witnesses, or procedures that allow parties to call their own witnesses to testify; see *Kelley* v. *Bonney*, supra, 570 n.14; are procedural safeguards common to quasi-judicial proceedings.

This court also has recognized the opportunity for counsel to be present and meaningfully assist their client during the proceeding as an important safeguard that helps to identify a quasi-judicial proceeding. The presence of counsel in adjudicatory proceedings serves to protect the parties from unfair or improper procedures and provides a means by which parties may effectively defend themselves. In concluding that the revocation hearing in *Kelley* was quasi-judicial, this court noted that the governing legislation specifically allowed for counsel to call witnesses, to cross-examine adverse witnesses, and to present oral argument. Id. (quoting provision in State Board of Education Regulations); see also id., 570. Indeed, many of the proceedings recognized by this court as quasi-judicial provided parties the same opportunity to have counsel present and to assist them during the proceeding. See, e.g., *Larmel* v. *Metro North Commuter Railroad Co.*, supra, 341 Conn. 336, 341 (plaintiff to arbitration proceeding was represented by counsel and could object to evidence); *Hopkins* v. *O'Connor*, supra, 282 Conn. 831 n.3 (respondents to commitment proceeding were entitled to representation by counsel, who could cross-examine adverse witnesses); *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 88 (police officer subject to internal affairs investigation had right to counsel).

Finally, this court frequently has recognized a party's right to appeal the adjudicator's decision as part of its conclusion that the proceeding at issue was quasi-judicial. In *Petyan*, the court relied on the fact that, "[a]t any time before the referee's decision [on an unemployment compensation claim] has become final within the periods of limitation . . . any party including the administrator, [could] appeal therefrom to the [Employment Security Board of Review]." (Internal quotation marks omitted.) *Petyan* v. *Ellis*, supra, 200 Conn. 249 n.4; see also *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 88 ("the [police] officer ha[d] a right to appeal to the personnel board of the city . . . [and] [t]hereafter . . . to the state labor board"); *Preston* v. *O'Rourke*, supra, 74 Conn. App. 312 ("either party could appeal to the trial court to request an order confirming the arbitrator's award or to vacate, modify or correct the award").

The right to appeal, or to have the proceeding officially reviewed, requires that an adequate record of the proceeding be available. See *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 88 ("the hearing officer

[took] notes on the testimony and evidence presented . . . which constitute[d] the record for the purposes of the hearing"); *Kelley* v. *Bonney*, supra, 221 Conn. 570 n.14 ("[a] verbatim transcript of the hearing shall be made and shall be supplied to all [parties and adjudicators]" (internal quotation marks omitted)); *Petyan* v. *Ellis*, supra, 200 Conn. 249 n.4 ("[any] appeal to the board shall be heard on the record of the hearing before the referee" (internal quotation marks omitted)). Therefore, when considering whether a proceeding is quasi-judicial in nature, we recognize a party's right to a meaningful appeal, which requires an adequate record of the proceeding, as an important procedural safeguard to ensure that facts were properly found and that law was appropriately applied.

In sum, there must be sufficient procedural safeguards to ensure reliability and to promote fundamental fairness. The more robust the procedural safeguards, the more likely a given proceeding will resemble a judicial proceeding and thereby be considered a quasi-judicial proceeding to which absolute immunity would apply.

C

The Second Circuit next asks us "[h]ow, if at all . . . the power factors enumerated in *Kelley* . . . and *Craig* . . . apply to the identification of a [proceeding] as quasi-judicial; and, if they do apply, are these factors in addition to . . . or independent of, a preliminary [law to fact] requirement?" (Citations omitted; internal quotation marks omitted.) *Khan* v. *Yale University*, supra, 27 F.4th 833. *Kelley* established, and *Priore* affirmed, that the *Kelley* factors are in addition to, not in lieu of, the other criteria discussed in this part of the opinion.

In *Kelley*, we recognized "a number of factors that *assist* in determining whether a proceeding is [quasi-judicial] in nature. Among them are whether the body has the power to: (1) exercise judgment and discretion; (2) hear and determine or to ascertain facts and decide;[24] (3) make binding orders and judgments; (4) affect the personal or property rights of private persons; (5) examine witnesses and hear the litigation of the issues on a hearing; and (6) enforce decisions or impose penalties." (Emphasis added; footnote added.) *Kelley* v. *Bonney*, supra, 221 Conn. 567. *Kelley* explained that courts must consider whether the entity conducting the proceeding has the power to determine facts and to apply appropriate law and requires proceeding participants to certify that statements were true and correct and to determine if there are sound public policy reasons for permitting absolute immunity. See id.

Since *Kelley*, we have explained that the *Kelley* factors are not exclusive and that, for the most part, they supplement, and function in addition to, the criteria

already discussed in this part of the opinion. See *Priore* v. *Haig*, supra, 344 Conn. 648. Accordingly, a court should consider the *Kelley* factors but need not conclude that they are dispositive. See id.

D

Next, the Second Circuit inquires "[h]ow, if at all, does public policy inform the identification of a [proceeding] as quasi-judicial and, if it does, is this consideration in addition to, or independent of, a [law to fact] requirement and the enumerated *Kelley/Craig* factors?" *Khan* v. *Yale University*, supra, 27 F.4th 833. In *Priore*, we clarified that "courts must always carefully scrutinize whether there is a sound public policy justification for the application of absolute immunity in any particular context." *Priore* v. *Haig*, supra, 344 Conn. 653.

We explained in *Priore* that, "[i]n most cases, the policy considerations require balancing the public interest of encouraging public participation and candor, on the one hand, and the private interest of protecting individuals from false and malicious statements, on the other." Id., 652. "The rationale underlying the [absolute] privilege is grounded [on] the proper and efficient administration of justice. . . . Participants in a judicial process must be able to testify or otherwise take part without being hampered by fear of [actions seeking damages for their statements]." (Internal quotation marks omitted.) Id., 646. However, because "[a]bsolute immunity . . . is strong medicine"; (internal quotation marks omitted) id., 652; it "must be reserved for those situations [in which] the public interest is so vital and apparent that it mandates complete freedom of expression without inquiry into a [speaker's] motives." (Internal quotation marks omitted.) Id., 663. It is only in these situations and judicial-like forums that "[t]he inconvenience of the individual [will] yield to a rule for the good of the general public." (Internal quotation marks omitted.) *Post* v. *Mendel*, 510 Pa. 213, 221, 507 A.2d 351 (1986).

Therefore, even if an entity applies law to facts in a proceeding with adequate procedural safeguards, the proceeding is not quasi-judicial if there is no discernable public policy supporting absolute immunity for proceeding participants. Likewise, public policy alone will not justify affording absolute immunity to proceeding participants if the proceeding is devoid of the basic, fundamental procedural protections inherent in judicial and quasi-judicial proceedings. Rather, a proceeding is quasi-judicial if, in addition to satisfying the indicia of an official judicial proceeding, as discussed in part II A through C of this opinion, public policy favors providing absolute immunity for proceeding participants.

III

Next, we are asked whether, in light of our responses to the above questions, the 2018 Yale UWC proceeding

at issue was properly recognized as quasi-judicial. See *Khan* v. *Yale University*, supra, 27 F.4th 833. We answer that question in the negative; the UWC proceeding cannot properly be recognized as quasi-judicial because it lacked the adequate procedural safeguards necessary for absolute immunity to apply.[25]

A

As a threshold matter, we recognize that disciplinary proceedings in response to allegations of sexual assault at institutions of higher education are specifically authorized by Connecticut law. Section 10a-55m (b) requires each Connecticut institution of higher education to adopt policies regarding sexual assault.[26] Such policies provide for, among other requirements, an investigation and disciplinary proceedings related to allegations of sexual violence. See General Statutes § 10a-55m (b) (6). If a disciplinary hearing is held, certain procedures and substantive requirements must be followed as specifically governed by state law. See General Statutes § 10a-55m (b) (6) (mandating procedural requirements and affirmative consent standards). Therefore, because the UWC proceeding was specifically authorized by law,[27] we now analyze whether it satisfies the requirements necessary for a proceeding to be recognized as quasi-judicial under Connecticut law.

B

Khan asserts that the UWC proceeding should not be recognized as quasi-judicial because the proceeding lacked judicial-like procedures and other indicia of reliability. Doe responds that the proceeding provided more than the minimum procedural safeguards that fundamental fairness requires. We agree with Khan and conclude that, even if the UWC hearing panel applied law to fact,[28] that the UWC proceeding did not have adequate procedural safeguards to be recognized as quasi-judicial for the purpose of affording absolute immunity to Doe. In reaching this conclusion, we reiterate that, in light of the procedural posture in which this case reaches us, we are obliged to accept the factual allegations as true and to draw all inferences in Khan's favor, and that we have considered in that light the complaint and all the documents appended to the complaint or incorporated in the complaint by reference, including the UWC procedures. See part I of this opinion.

After reviewing the record before us, we conclude that the UWC proceeding did not incorporate sufficient procedural safeguards to be considered quasi-judicial. Specifically, the UWC proceeding failed (1) to require complainants to testify under oath or to subject them to explicit and meaningful penalties for untruthful statements, (2) to provide Khan, or his counsel, the meaningful opportunity to cross-examine adverse witnesses in real time, (3) to provide parties a reasonable opportu-

nity to call witnesses to testify, (4) to afford Khan the opportunity to have the active assistance of counsel during the UWC hearing, and (5) to provide Khan any record or transcript of the proceeding that would assist him in obtaining adequate review of the UWC decision or to expose the legitimacy or fairness of the proceeding to public scrutiny. Although we do not maintain that all of these procedural features are required for our recognition of a quasi-judicial proceeding, we conclude that the collective absence of such features militates against a determination that the proceeding had adequate safeguards to ensure reliability and promote fundamental fairness.

1

First, witnesses in the UWC proceeding did not testify under oath, provide sworn statements, or certify to the truth of their statements. The UWC's only protection against false statements is the threat that the "[f]ailure to provide truthful information . . . may result in a recommendation for a more severe penalty or a referral for discipline." Because Doe had graduated from Yale by the time of the proceedings; *Khan* v. *Yale University*, supra, 511 F. Supp. 3d 218; she presumably could not be subject to any disciplinary consequences for failing to testify truthfully.

The failure of the UWC to place Doe under oath or otherwise have her certify to the truth of her statements, subject to a penalty for untruthfulness, undermined the reliability of Doe's statements. See *Priore* v. *Haig*, supra, 344 Conn. 655 (declining to recognize town planning and zoning commission's public hearing as quasi-judicial in part because declarants were not under oath or required to certify truth of statements). As we explained in *Petyan*, the penalty of perjury is "simply part of the price that is paid for witnesses who are free from intimidation by the possibility of civil liability for what they say." (Internal quotation marks omitted.) *Petyan* v. *Ellis*, supra, 200 Conn. 251; see *Priore* v. *Haig*, supra, 655 n.4 ("[a] witness' reliability is ensured by his [or her] oath, the hazard of cross-examination and the threat of prosecution for perjury" (internal quotation marks omitted)). The oath or certification requirement is fundamental to the reliability of the information presented. Yale's failure to display any means of holding witnesses accountable for untruthful statements significantly weakens Doe's contention that the UWC proceeding is quasi-judicial.

2

Second, the UWC proceeding did not permit live, real-time cross-examination of witnesses or any reasonable opportunity for parties to confront witnesses. In fact, neither Khan nor his counsel was permitted to be in the hearing room when Doe was questioned. Rather, they were required to sit in an anteroom, where they

could only listen to an audio feed of the hearing and could not see or be seen by Doe. Khan claims that he and his counsel were denied the opportunity to ask *any* questions of Doe or to cross-examine her in *any* way.[29] As a result, Khan alleges that he was "denied any reasonable opportunity to confront, question, or otherwise face his accuser."

The opportunity to meaningfully cross-examine adverse witnesses is vitally important to the truth seeking function of any judicial or quasi-judicial proceeding and is necessary if a university's disciplinary proceeding is to be considered quasi-judicial. In *Doe* v. *Baum*, 903 F.3d 575 (6th Cir. 2018), the United States Court of Appeals for the Sixth Circuit concluded that due process required that universities allow for some form of live cross-examination when a witness' "credibility" is at issue in a school disciplinary hearing. Id., 581; see also id., 583. The court explained that, "when the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination." Id., 581.[30]

The California Court of Appeal reached a similar conclusion in *Doe* v. *Allee*, 30 Cal. App. 5th 1036, 242 Cal. Rptr. 3d 109 (2019). There, the court held that, "when a student accused of sexual misconduct faces severe disciplinary sanctions, and the credibility of witnesses (whether the accusing student, other witnesses, or both) is central to the adjudication of the allegation, fundamental fairness requires, at a minimum, that the university provide a mechanism by which the accused may cross-examine those witnesses, directly or indirectly . . . ." Id., 1039.

Meaningful cross-examination allows for witness testimony to be challenged in real time, whether in person or through advanced video technology that allows for instant two-way communications and follow-up questions. It is equally important, in our view, that the accused *and the accuser* be provided a chance to cross-examine one another so as to allow the fact finder to assess the consistency of testimony and demeanor of both the parties when their testimony is called into question. See, e.g., id., 1065–66.

Our review of the UWC procedures provides us with no assurance that Khan had a meaningful opportunity to cross-examine or otherwise confront Doe in real time. We also have no record of the proceeding to demonstrate that the UWC varied from the procedures incorporated in the complaint in a manner that afforded Khan fundamental fairness. Although, under the UWC procedures, Khan and Doe were able to submit questions that they wanted the UWC hearing panel to ask, the panel had sole discretion to reject the questions or not to ask them. Thus, the UWC procedures hampered Khan's ability to ask legitimate questions or to sequence questions in a way he believed would test the veracity

of Doe's testimony at the hearing. Accordingly, the procedures utilized by the UWC failed to provide Khan with an opportunity to challenge the statements Doe made to the investigator and to the UWC panel.

Allowing for confrontation of an accuser while still preventing abusive questioning is no doubt a difficult balance to strike, but fundamental fairness requires some measure of meaningful cross-examination, and the present record compels us to conclude that the UWC procedures fall short. Therefore, Khan was denied a fundamental procedural protection essential to quasi-judicial proceedings because he was not given a meaningful opportunity to test the veracity or reliability of Doe's testimony in real time.

### 3

Third, unlike most of the proceedings that this court has recognized as quasi-judicial, the UWC proceeding did not provide the parties a reasonable opportunity to call witnesses. Although the UWC procedures allowed parties to request that the UWC hearing panel call witnesses to testify, the procedures provided no standards regarding whether the panel would in fact call or interview them, and there was no independent mechanism by which parties could call their own witnesses.[31]

At private universities, as in other settings, "basic principles of . . . fundamental fairness [are] adhered to [when] the students involved . . . [are allowed, among other things] to *call their own witnesses* . . . ." (Emphasis added; internal quotation marks omitted.) *Doe* v. *University of the Sciences*, 961 F.3d 203, 214 (3d Cir. 2020); see, e.g., id., 211, 215–16 (determining that student conduct procedures were not fair in breach of contract case). Supporting this basic tenet of procedural fairness, § 10a-55m (b), the Connecticut statutory provision that authorizes sexual assault disciplinary proceedings at institutions of higher education, requires that "[e]ach institution of higher education . . . adopt and disclose . . . (6) . . . a summary of such institution's student investigation and disciplinary procedures, including clear statements . . . (C) [that the student responding to reports of sexual assault] . . . (ii) *shall have the opportunity to present evidence and witnesses* on their behalf during any disciplinary proceeding . . . ." (Emphasis added.)

The fact that the UWC hearing panel could, "[a]t its sole discretion," reject any witnesses recommended by Khan deprived Khan of a fair opportunity to present a defense by calling or presenting witnesses, if he so chose,[32] to testify on his behalf. Under these circumstances, a person in Khan's position is left to rely on the grace of the panel to aid in his defense by presenting the in-person testimony of favorable witnesses. As a result, Yale's UWC policy does not comport with the protections typical of quasi-judicial proceedings.

Fourth, the UWC proceeding materially limited the assistance of counsel throughout the hearing. Under the UWC procedures, "[a] party may be accompanied by an adviser . . . [but] [t]he adviser may not submit documents, either directly or indirectly, on a party's behalf at any stage of the process, nor speak for the party during an interview with a [fact finder] or during a formal hearing." In practice, this meant that counsel could not present any argument, either orally or in writing, on Khan's behalf, raise objections, or be present during—let alone participate in—the questioning of witnesses. These restrictions effectively rendered counsel irrelevant, relegating Khan's attorney to the status of the proverbial potted plant.

Our cases recognize that the assistance of counsel during a quasi-judicial proceeding is an important procedural safeguard to ensure the procedural and evidentiary fairness of a judicial proceeding. See part II B of this opinion. The active assistance of counsel is especially important in settings like the one at issue, when the accused or accuser may lack experience with self-advocacy or representing his or her interests in an adversarial process that involves significant consequences for the individual parties. Limitations on counsel's assistance during the proceeding will bear on whether the proceeding is quasi-judicial. In the present case, the UWC's procedures prohibited Khan's counsel from speaking on Khan's behalf, objecting to evidence, examining Khan's accusers, and submitting documents to the UWC panel. Although we do not agree with Khan's contention that these prohibitions predetermined the outcome of the hearing, we do agree that the restrictions placed on counsel's participation in the proceeding support the conclusion that the proceeding was not quasi-judicial.

Finally, the UWC proceeding limited a party's ability to seek review of the UWC panel's decision because it failed to establish an adequate record of the proceedings.[33] Although the UWC procedures require that the secretary of the UWC keep minutes from the meeting and a record of all the actions and reports filed, they explicitly provide that "[t]he minutes do not record statements, testimony, or questions." The UWC panel specifically denied Khan's request that it make a transcript or other electronic recording of the hearing for the purpose of further review.

We have long recognized that the maintenance of a transcript or record is critical and a key feature of any quasi-judicial proceeding. For instance, in concluding that the proceeding in *Craig* was quasi-judicial, we relied on the fact that, "[d]uring the hearing, the hearing officer [took] notes on the testimony and evidence pre-

sented and, thereafter, transcribes his notes into typed form, which constitute[d] the record for the purposes of the hearing." *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 88. After the hearing, the record could be reviewed on appeal. See id. Similarly, in *Kelley*, the applicable state Board of Education regulation required that "[a] verbatim transcript of the hearing . . . be supplied to all members of the board, to the holder, to the requesting party, and to the secretary of the local board." (Internal quotation marks omitted.) *Kelley* v. *Bonney*, supra, 221 Conn. 570 n.14.

In the present case, Khan's ability to appeal was severely constrained by the absence of any transcript or recording of statements, testimony, or questions raised during the UWC hearing. That restriction was especially prejudicial in light of the fact that his counsel was not permitted to object when UWC panel members allegedly assumed facts not in evidence and otherwise violated core evidentiary principles.

C

On the basis of the foregoing, we conclude that the UWC proceeding lacked adequate procedural safeguards to ensure the reliability of the statements made in the proceeding and, therefore, did not qualify as quasi-judicial for purposes of absolute immunity. Our conclusion finds support in the decisions of other courts determining whether a university disciplinary proceeding had adequate procedural protections.

We find persuasive the decision of the United States District Court for the Eastern District of Virginia in *Doe* v. *Roe*, supra, 295 F. Supp. 3d 664. In that case, the District Court determined that disciplinary proceedings conducted at Marymount University were not quasi-judicial because they failed to afford the plaintiff basic due process protections. See id., 674. The District Court explained that, "[i]n determining whether a proceeding is quasi-judicial in nature, [courts] have stressed elements associated with notions of due process, including requirements for notice, a hearing, an unbiased adjudicator, and the ability to [marshal and present evidence and to call and cross-examine witnesses]." (Internal quotation marks omitted.) Id. The court ultimately held that, because the plaintiff "was not permitted to present exculpatory or documentary evidence, to call witnesses, or to confront and cross-examine his accuser, and significantly . . . was denied the opportunity to have an in-person hearing before [an] adjudicator . . . [there were no] guarantees of due process and fairness . . . ." (Citation omitted; footnote omitted.) Id., 674–75.

That court's reasoning is echoed in federal appellate decisions. For example, in *Overall* v. *University of Pennsylvania*, 412 F.3d 492 (3d Cir. 2005), the United States Court of Appeals for the Third Circuit declined to recognize a private grievance proceeding at a university as

quasi-judicial in nature. See id., 498. Observing that quasi-judicial proceedings "involve basic procedural safeguards," the court relied on the fact that the private grievance proceeding at issue "did not require sworn testimony. The volunteer faculty members who presided over the hearing lacked the power to make any binding judgment or enforce any disciplinary measures . . . [a]nd of particular relevance to [the] case, no one kept a transcript of what was said during the hearing, so there is no record of exactly what [the defendant] said when he allegedly defamed [the plaintiff]." Id.

Likewise, in *Doe* v. *University of the Sciences*, supra, 961 F.3d 203, the Third Circuit determined that, at private universities, "basic principles of . . . fundamental fairness [are] adhered to [when] the students [involved] . . . [are] given notice of the charges and evidence against them, [are] allowed to be present and to participate in the hearing assisted by faculty, to call their own witnesses and to cross-examine the witnesses against them, and [are] fully apprised of the findings of the [h]earing [p]anel." (Internal quotation marks omitted.) Id., 214. The Third Circuit cautioned that fair process at a private university's sexual misconduct investigation would require, at a minimum, "the modest procedural protections of a live, meaningful, and adversarial hearing and the chance to test witnesses' credibility through some method of cross-examination." Id., 215.

Accordingly, because the UWC proceeding lacked the basic procedural safeguards that this court and other courts have deemed necessary to ensure the reliability of the information presented, we decline to recognize the UWC proceeding as quasi-judicial in nature for the purpose of affording Doe absolute immunity for her statements.[34]

IV

The Second Circuit next asks us, in light of our determination that the UWC proceeding was not quasi-judicial, whether Connecticut law would afford Doe qualified immunity or no immunity at all. *Khan* v. *Yale University*, supra, 27 F.4th 834.[35] We answer that public policy supports a qualified privilege for participants in certain sexual misconduct proceedings. Nevertheless, because this matter is at the motion to dismiss stage and Khan has sufficiently alleged malice, we are unable to determine whether Doe is entitled to qualified immunity as a matter of law. At a later stage in the case, a court may reconsider the privilege as the factual record is developed.

Our standard of review is clear: "A defendant may shield himself from liability for defamation by asserting the defense that the communication is protected by a qualified privilege. . . . When considering whether a qualified privilege protects a defendant in a defamation case, the court must resolve two inquiries. . . . The

first is whether the privilege applies, which is a question of law over which our review is plenary. . . . The second is whether the applicable privilege nevertheless has been defeated through its abuse, which is a question of fact." (Citations omitted.) *Gambardella* v. *Apple Health Care, Inc.*, 291 Conn. 620, 628, 969 A.2d 736 (2009).

A

We first consider whether a qualified privilege should apply to statements made by alleged victims in a sexual misconduct hearing at an institution of higher education.

Unlike absolute immunity, which provides a blanket protection for a speaker's false statements, a qualified privilege protects only those allegedly defamatory statements that are not made maliciously. See *Gallo* v. *Barile*, supra, 284 Conn. 463 n.6. A qualified privilege is appropriate when it "is based [on] a public policy that recognizes that it is desirable that true information be given whenever it is reasonably necessary for the protection of the actor's own interests, the interests of a third person or certain interests of the public . . . ." (Internal quotation marks omitted.) Id., 468 n.12; see 3 Restatement (Second), Torts §§ 594 through 598, pp. 263–81 (1977). In other words, a qualified privilege is appropriate when the legitimate public or private interest underlying the publication of statements outweighs the important reputational interests of the individual. See 50 Am. Jur. 2d 624, Libel and Slander § 259 (2017); see also *Rioux* v. *Barry*, 283 Conn. 338, 346, 927 A.2d 304 (2007) ("whether and what form of immunity applies in any given case is a matter of policy that requires a balancing of interests"). Importantly, a qualified privilege for communications made to advance certain public interests or to protect individuals is applicable only when the communications are made to those who may be expected to take official action of some kind for the protection of those interests or individuals. See, e.g., *Gallo* v. *Barile*, supra, 468–69 n.12, citing W. Keeton et al., supra, § 115, p. 830; *Government Micro Resources, Inc.* v. *Jackson*, 271 Va. 29, 43, 624 S.E.2d 63 (2006) ("qualified privilege protects a communication from allegations of defamation if made in good faith, to and by persons who have corresponding duties or interests in the subject of the communication"); see also, e.g., 3 Restatement (Second), supra, § 598, p. 281.

For example, in *Gallo* v. *Barile*, supra, 284 Conn. 459, this court engaged in a balancing test to determine whether an absolute or a qualified privilege is appropriate for statements made to the police in connection with a criminal investigation. See id., 468–72. This court concluded that those statements were subject to a qualified privilege, explaining that "a qualified privilege is sufficiently protective of [those] wishing to report events concerning [a] crime . . . [because] [t]here is

no benefit to society or the administration of justice in protecting those who make intentionally false and malicious defamatory statements to the police. The countervailing harm caused by the malicious destruction of another's reputation by false accusation can have irreparable consequences. . . . [T]he law should provide a [judicial] remedy in [such] situations . . . ." (Internal quotation marks omitted.) Id., 471–72; see also *Petyan* v. *Ellis*, supra, 200 Conn. 252 (recognizing qualified immunity for complaining witness who initiates prosecution).

Although the question of whether a qualified privilege should be afforded to statements made at sexual misconduct hearings at institutions of higher education is one of first impression for this court, we find instructive the decision of the United States District Court for the District of Maryland in *Doe* v. *Salisbury University*, 123 F. Supp. 3d 748 (D. Md. 2015). In that case, the District Court recognized that defamatory statements made regarding an alleged sexual assault on a college campus would enjoy a conditional, or qualified, privilege under Maryland law. See id., 758–59. The court reasoned that Maryland courts recognize a conditional privilege for statements "made in furtherance of [the victims'] legitimate interest in personal safety and the safety of those closest to [them]." Id., 758; see also id., 759. Without such privilege, "[v]ictims would have to weigh, on the one hand, the value of reaching out for help in the aftermath of a traumatic sexual assault, and on the other hand the risk that they could be subject to civil liability for defamation if the occurrence of sexual assault is contested by the alleged perpetrator." Id., 759.

Similarly, in *Doe* v. *Roe*, supra, 295 F. Supp. 3d 664, the District Court for the Eastern District of Virginia concluded that, when allegations of sexual assault are made during a university Title IX investigation, "qualified immunity, not absolute immunity, is the appropriate privilege to apply . . . ." Id., 676. The court reached that conclusion after determining that the proceeding lacked basic due process protections to afford proceeding participants absolute immunity. See id., 674–75; see also part III C of this opinion.

Just as our case law provides a qualified privilege to individuals reporting crimes to the police, the public policy of this state supports providing a qualified privilege for statements made by individuals alleging sexual assault to proper authorities at institutions of higher education. See General Statutes § 10a-55m. As the amici explain, sexual assault remains a serious and vastly underreported crime. The hesitation of victims to report such crimes is, in no small part, due to a fear of retaliation.[36] The hesitation to report sexual misconduct may be especially pronounced on college campuses, and fears and concerns surrounding such reports would undoubtedly be compounded if victims had to worry that any

report they made could also be the subject of a defamation suit. See, e.g., *Sagaille* v. *Carrega*, 194 App. Div. 3d 92, 94, 143 N.Y.S.3d 36 ("defamation suits . . . constitute [one] form of retaliation against those with the courage to speak out"), appeal denied, 37 N.Y.3d 909, 174 N.E.3d 710, 152 N.Y.S.3d 685 (2021).

Our legislature has responded aggressively to address these concerns. As we discussed, § 10a-55m requires institutions of higher education to establish disciplinary committees and related reporting systems for crimes of sexual violence. See part III A and footnote 26 of this opinion. In 2012, the Connecticut legislature expanded on the federal Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act)[37] by enacting No. 12-78 of the 2012 Public Acts (P.A. 12-78), titled "An Act Concerning Sexual Violence on College Campuses."[38] Public Act 12-78, § 1, requires higher education institutions to run prevention and awareness programs for all students that provide information concerning the reporting of incidences of sexual assault and violence. In addition, P.A. 12-78, § 1, as codified, requires institutions to establish a campus resource team dedicated to providing support and a victim centered response to reported sexual assault victims and to provide free counseling and advocacy services. See General Statutes (Rev. to 2013) § 10a-55m (b) (2) (now § 10a-55m (b) (3)).

In 2014, our legislature passed a law to provide additional services for those victimized by sexual violence on college campuses. Public Acts 2014, No. 14-11, § 2 (P.A. 14-11). Specifically, P.A. 14-11, § 2, as codified, permits anonymous reporting to authorities at institutions of higher education.[39] General Statutes (Rev. to 2015) § 10a-55m (d). Public Act 14-11, § 2, as codified, also mandates that institutions of higher education disclose their disciplinary and reporting procedures to the joint standing committee of the General Assembly having cognizance of matters relating to higher education. See General Statutes (Rev. to 2015) § 10a-55m (f).

The legislature took further action in 2016, enacting No. 16-106 of the 2016 Public Acts, which required all campus hearings regarding claims of sexual misconduct to apply an affirmative consent[40] standard. See Public Acts 2016, No. 16-106, § 1. Each of these measures reflects a strong public commitment to protecting alleged victims of sexual assault on college and university campuses, encouraging them to report claims of sexual violence, and allowing them to obtain justice with dignity and privacy.

Thus, given the legitimate public interests that our legislature has articulated, we conclude that a qualified privilege is appropriate to afford alleged victims of sexual assault who report their abuse to proper authorities at institutions of higher education. "On the one hand, the privilege encourages victims of sexual assault to

speak candidly with university officials and to report abuse by immunizing their good-faith reports. . . . At the same time, the qualified nature of the privilege provides plaintiffs with an opportunity to overcome the privilege in those rare instances [in which] a report is made, not in good faith, but rather with malice." *Doe* v. *Roe*, supra, 295 F. Supp. 3d 677.

B

Because a qualified privilege is available to Doe, the question becomes whether the privilege has been defeated. See *Bleich* v. *Ortiz*, 196 Conn. 498, 504, 493 A.2d 236 (1985) ("[e]ven [if the court determines that] a legitimate interest is at stake, a claim of conditional [or qualified] privilege is defeated if the defendant acts with malice in making the defamatory communication at issue").[41]

At the motion to dismiss stage, the court must accept the factual allegations in the complaint as true and must draw inferences in the plaintiff's favor. See Fed. R. Civ. P. 12 (b) (6). Consequently, if the plaintiff sufficiently alleges with particular facts that the defendant acted with malice when making the statement(s) at issue, at the motion to dismiss stage, the court must take those allegations as true, and, therefore, the privilege will be defeated at this stage of the proceedings.[42] See *Doe* v. *College of Wooster*, Docket No. 5:16-cv-979, 2018 WL 838630, *9 (N.D. Ohio February 13, 2018) (denying motion to dismiss sexual assault defamation claim based on qualified privilege because pleadings demonstrated actual malice sufficient to defeat qualified privilege); *Jackson* v. *Liberty University*, Docket No. 6:17-CV-00041, 2017 WL 3326972, *14 (W.D. Va. August 3, 2017) (at motion to dismiss stage, "there [were] sufficient, [nonconclusory] facts showing the malice required to overcome the qualified privilege [because the plaintiff pleaded facts indicating that sexual assault accusations were unjustifiably motivated]"); *Routh* v. *University of Rochester*, 981 F. Supp. 2d 184, 213 (W.D.N.Y. 2013) ("consideration of facts outside of the complaint [is] inappropriate . . . on a motion to dismiss" (internal quotation marks omitted)), appeal withdrawn, United States Court of Appeals, Docket No. 13-4623 (2d Cir. January 9, 2014).

In this case, Khan alleged in his complaint that Doe made false accusations for the sake of trying to expel Khan as part of a larger political movement and personal vendetta. Khan asserts that Doe made romantic advances toward him. He further alleges that, at first, she told a campus health care worker that she had engaged in consensual unprotected sex. Khan contends that Doe reported rape to her friends and, ultimately, to the Title IX coordinator only because she was ashamed of her sexual advances and encouraged by the larger political movement waged against Khan. Specifically, Khan cites in his complaint how, despite a jury's dis-

missing Doe's allegation and finding Khan not guilty of criminal sexual assault charges, more than 77,000 people signed a petition protesting Khan's readmission to Yale. On the basis of these assertions, which must be accepted as true for the purpose of reviewing Doe's motion to dismiss, a reasonable inference could be drawn that Doe knowingly fabricated claims of sexual assault.

Therefore, we conclude that, although a qualified privilege against claims of defamation is available to participants in sexual misconduct proceedings at institutions of higher education, Khan has alleged sufficient facts in his complaint to defeat Doe's qualified privilege at the motion to dismiss stage. A more complete factual record, however, may warrant revisiting Doe's qualified privilege at the summary judgment stage or when submitting the matter to a jury. See *Doe* v. *Roe*, supra, 295 F. Supp. 3d 677–78 (concluding that defendant was not entitled to qualified immunity at motion to dismiss stage but not foreclosing that qualified immunity may be established as matter of law during later stage of proceedings).

## SUMMARY

The answer to the first certified question as modified is: A quasi-judicial proceeding is an adjudicative one, in which the proceeding is specifically authorized by law, the entity conducting the proceeding applies the law to the facts within a framework that contains procedural safeguards, and there is a sound public policy justification for affording proceeding participants absolute immunity.

The answer to the second certified question as modified is: No, the UWC proceeding was not quasi-judicial because it lacked important procedural safeguards. Accordingly, we need not answer the third certified question.

The answer to the fourth certified question as modified is: Yes, a qualified privilege is available to alleged victims of sexual assault who report their abuse to proper authorities at institutions of higher education, but, at this stage of the proceedings, the allegations of malice in Khan's complaint are sufficient to defeat Doe's entitlement to qualified immunity as a matter of law.

No costs shall be taxed in this court to any party.

In this opinion the other justices concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] As we discuss hereinafter, Khan was tried for and acquitted of criminal sexual assault charges arising from Doe's accusations. *Khan* v. *Yale University*, 27 F.4th 805, 811 (2d Cir. 2022). Khan has not raised any claims against Doe for her statements to law enforcement or her testimony at his criminal trial. See *Khan* v. *Yale University*, 511 F. Supp. 3d 213, 227 (D. Conn. 2021).

[3] General Statutes § 51-199b (d) provides in relevant part: "The Supreme Court may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate

decision, constitutional provision or statute of this state."

[4] After accepting the certified questions of law, we granted permission to Legal Momentum, Fierberg National Law Group and thirteen coamici to file an amici curiae brief in support of Doe's claim that statements made in the course of Title IX processes should be afforded absolute immunity.

[5] The court cited to M. Sable et al., "Barriers to Reporting Sexual Assault for Women and Men: Perspectives of College Students," 55 J. Am. Coll. Health 157, 157–62 (2006).

[6] Although § 10a-55m was the subject of certain amendments since the events underlying this appeal; see, e.g., Public Acts 2021, No. 21-81, §§ 1 and 4; Public Acts 2019, No. 19-189, § 2; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, unless otherwise indicated, we refer to the current revision of the statute.

[7] Although we do not doubt that false accusations of this nature are uncommon, they can be made, especially if certain fundamental procedural safeguards are not securely in place. See National Sexual Violence Resource Center, False Reporting: Overview (2012) pp. 2–3, available at https://www.nsvrc.org/sites/default/files/Publications_NSVRC_Overview_False-Reporting.pdf (last visited June 21, 2023) (estimating that prevalence of false reporting of sexual assaults is between 2 and 10 percent of total reports).

[8] Khan also alleged violations of Title IX; see footnote 11 of this opinion; breach of contract, breach of the implied warranty of fair dealing, negligent infliction of emotional distress, intentional infliction of emotional distress, and breach of privacy against Yale and various employees of Yale. See *Khan* v. *Yale University*, 511 F. Supp. 3d 213, 216, 219 (D. Conn. 2021). Yale and its employees also were named as defendants, but they are not parties to this appeal. For the sake of simplicity, we refer to Doe by name throughout this opinion and to the other defendants by name when necessary.

[9] Section 51-199b (g) directs that, "[i]f the parties cannot agree upon a statement of facts, then the certifying court shall determine the relevant facts and shall state them as a part of its certification order."

However, given the procedural posture of this case, no facts have yet been found because Khan appealed to the Second Circuit from the District Court's granting of Doe's motion to dismiss pursuant to rule 12 (b) (6) of the Federal Rules of Civil Procedure.

[10] Yale College is the undergraduate branch of Yale University. We hereinafter refer to Yale College by its full name.

[11] Title IX was enacted as part of the Education Amendments of 1972. Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235, 373–75 (codified as amended at 20 U.S.C. § 1681 et seq.). Title IX provides in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681 (a) (2018).

[12] As we explain later, "[the UWC procedures] explicitly provide that '[t]he minutes [of the UWC hearing] do not record statements, testimony, or questions.' " Part III B 5 of this opinion.

[13] In his complaint, Khan alleges that he was born in a refugee camp in Pakistan after his family fled from the Taliban in Afghanistan and that he and his family subsequently fled from a Pakistani terrorist group to the United Arab Emirates.

[14] *Khan* v. *Yale University*, supra, 27 F.4th 834 ("the Connecticut Supreme Court may modify or expand these certified questions or address any other issues of Connecticut law pertinent to this appeal").

[15] On September 7, 2022, after the parties filed briefs in this appeal, we released our decision in *Priore* v. *Haig*, supra, 344 Conn. 636, which addressed issues relating to quasi-judicial proceedings and absolute immunity. Accordingly, prior to oral arguments before this court, we ordered the parties to file supplemental briefs to address the applicability, if any, of *Priore*.

[16] See, e.g., *Briscoe* v. *LaHue*, 460 U.S. 325, 330–31, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983) (tracing judicial immunity to sixteenth century); *Khan* v. *Yale University*, supra, 27 F.4th 818 (explaining origins of absolute immunity); see also, e.g., *Buckley* v. *Wood*, 76 Eng. Rep. 888, 889 (K.B. 1591) (holding that accused could not pursue defamation action because accuser's statements were made in "[the] course of justice").

[17] *Kelley* further explained that "an absolute privilege also attaches to relevant statements made during administrative proceedings [that] are [quasi-judicial] in nature. . . . Once it is determined that a proceeding is [quasi-judicial] in nature, the absolute privilege that is granted to statements

made in furtherance of it extends to every step of the proceeding until final disposition." (Citations omitted; internal quotation marks omitted.) *Kelley* v. *Bonney*, supra, 221 Conn. 566.

[18] Other courts have adhered to a similar requirement. See, e.g., *Overall* v. *University of Pennsylvania*, 412 F.3d 492, 497 (3d Cir. 2005) ("quasi-judicial privilege consistently involve[s] proceedings before federal, state, or local governmental bodies, *or proceedings held pursuant to a statute or administrative regulation*" (emphasis added)); see also, e.g., *Bose* v. *Bea*, 947 F.3d 983, 995 (6th Cir. 2020) ("[quasi-judicial proceedings must be] *tied to a statute* or to powers [that] the [state] legislature had specifically granted to the tribunal at issue" (emphasis added)), cert. denied,       U.S.    , 141 S. Ct. 1051, 208 L. Ed. 2d 521 (2021).

[19] Although arbitration proceedings fall outside of the scope of traditional governmental proceedings and administrative hearings, we nonetheless recognize that arbitrations are statutorily authorized, designed to be an alternative dispute resolution forum to official judicial proceedings, contain procedural safeguards, and are subject to judicial review. Thus, we have concluded that arbitrations may be quasi-judicial. See *Larmel* v. *Metro North Commuter Railroad Co.*, 341 Conn. 332, 341, 267 A.3d 162 (2021).

[20] We note that, "[a]lthough Connecticut appellate courts have not addressed [legislative immunity for witnesses], other jurisdictions have held that witnesses in a legislative proceeding are entitled to absolute immunity." *Priore* v. *Haig*, supra, 344 Conn. 670 (*D'Auria, J.*, concurring in part and concurring in the judgment); see, e.g., *Beverly Enterprises, Inc.* v. *Trump*, 1 F. Supp. 2d 489, 493 (W.D. Pa. 1998) ("the definition of a legislative proceeding is broad enough to encompass proceedings—including informal fact-finding, information gathering, or investigative activities—that are conducted by legislators with the objective purpose of aiding the legislators in the drafting, debating, or adopting of proposed legislation"), aff'd, 182 F.3d 183 (3d Cir. 1999), cert. denied, 528 U.S. 1078, 120 S. Ct. 795, 145 L. Ed. 2d 670 (2000); 3 Restatement (Second), Torts § 590A, p. 254 (1977) ("[a] witness is absolutely privileged to publish defamatory matter as part of a legislative proceeding in which he is testifying or in communications preliminary to the proceeding, if the matter has some relation to the proceeding"). In this matter, the doctrine of legislative immunity has no application.

[21] The collective bargaining agreement in *Craig* was governed by the Municipal Employee Relations Act. See *Khan* v. *Yale University*, supra, 27 F.4th 822 n.22.

[22] Although we determined that the zoning commission applied law to fact, we concluded that the proceeding was not quasi-judicial for the reasons articulated in part II B of this opinion. See *Priore* v. *Haig*, supra, 344 Conn. 655, 661.

[23] General Statutes § 53a-156 (a) provides that "[a] person is guilty of perjury if, in any official proceeding, such person intentionally, *under oath* or in an unsworn declaration under sections 1-65aa to 1-65hh, inclusive, makes a false statement, swears, affirms or testifies falsely, to a material statement which such person does not believe to be true." (Emphasis added.)

General Statutes § 53a-146 (1) defines an "official proceeding" as "any proceeding held or which may be held before any legislative, judicial, administrative or other agency or official authorized to take evidence *under oath*, including any referee, hearing examiner, commissioner or notary or other person taking evidence in connection with any proceeding." (Emphasis added.)

For purposes of this appeal, we need not decide whether it would ever be appropriate to afford absolute immunity to participants in a proceeding that did not qualify as official for purposes of §§ 53a-146 and 53a-156, or that did not provide explicit and meaningful penalties for false testimony made during the proceeding.

[24] We note that "the first two factors largely mirror *Petyan*'s law to fact requirement." *Priore* v. *Haig*, supra, 344 Conn. 648.

[25] We need not consider whether participants to a proceeding may receive absolute immunity on some ground other than quasi-judicial immunity, as "the only question before [this] court is whether the UWC disciplinary proceeding itself is quasi-judicial. Doe does not assert, and the [D]istrict [C]ourt did not find, that, even if that proceeding was not quasi-judicial, there was some other basis for extending absolute immunity to Doe's statements at the proceeding." *Khan* v. *Yale University*, supra, 27 F.4th 830.

[26] General Statutes § 10a-55m (b) provides in relevant part: "Each institution of higher education shall adopt and disclose in such institution's annual uniform campus crime report one or more policies regarding sexual assault

. . . . Such policy or policies shall include provisions for:

"(1) Informing students and employees that . . . (A) affirmative consent is the standard . . .

* * *

"(6) Disclosing a summary of such institution's student investigation and disciplinary procedures, including clear statements advising that (A) a student or employee who reports or discloses being a victim of sexual assault . . . shall have the opportunity to request that an investigation begin promptly, (B) the investigation and any disciplinary proceedings shall be conducted by an official trained annually . . . (C) both the student or employee who reports or discloses the alleged assault . . . and the student responding to such report or disclosure (i) are entitled to be accompanied to any meeting or proceeding relating to the allegation of such assault . . . by an advisor or support person of their choice, provided the involvement of such advisor or support person does not result in the postponement or delay of such meeting as scheduled, and (ii) shall have the opportunity to present evidence and witnesses on their behalf during any disciplinary proceeding, (D) both the student or employee reporting or disclosing the alleged assault . . . and such responding student are entitled to be informed in writing of the results of any disciplinary proceeding not later than one business day after the conclusion of such proceeding, (E) the institution of higher education shall not disclose the identity of any party to an investigation or disciplinary proceeding, except as necessary to carry out the investigation or disciplinary proceeding or as permitted under state or federal law, (F) a standard of affirmative consent is used in determining whether consent to engage in sexual activity was given by all persons who engaged in the sexual activity, and . . .

* * *

"(8) Disclosing the range of sanctions that may be imposed following the implementation of such institution's student and employee disciplinary procedures in response to such assault . . . ."

[27] We need not address whether the UWC proceeding was specifically authorized by federal law because it was specifically authorized by state law. Nonetheless, we note that many of the Title IX disciplinary procedures for sexual assault at the time of Khan's hearing were guidance and not yet codified at 34 C.F.R. § 106.45 (b) (6) (i) (2020).

[28] The parties disagree as to whether the UWC hearing panel had the power of discretion to apply law to fact. Doe argues that the UWC panel applied both Title IX regulations and § 10a-55m, which mandated that the panel determine whether she affirmatively consented to the parties' sexual encounter. Khan argues that Title IX simply requires the development and application of a sexual misconduct policy, whereas § 10a-55m only mandated the application of an affirmative consent standard. Therefore, he argues that the only authority being applied is university policy, not the law. Beyond the dispute about whether the UWC panel applied established law, we have doubts regarding whether the panel functioned in an adjudicatory manner, or had the power to apply law to fact, considering that the panel merely penned a recommendation to the dean of Yale College, who ultimately decided the fate of Khan without conducting a fact-finding inquiry. See UWC Procedures § 7.5, p. 107 (October 26, 2015) ("the [dean of Yale College] will . . . accept the panel's findings of fact, but may accept, reject, or modify the panel's conclusions or recommendations, in whole or in part"). Nonetheless, because we conclude that minimum procedural safeguards were lacking, we need not resolve this dispute and determine whether the proceeding satisfied the law to fact requirement.

[29] Doe argues that the UWC procedures allowed Khan to submit questions to the UWC panel, but neither the policies nor Doe specified the timing of when those questions could be submitted. Khan argues that neither he nor his counsel had any opportunity to ask Doe questions because the UWC procedures permitted only the UWC panel to ask questions and provided the panel with sole discretion to reject or not to ask any questions.

[30] The importance of cross-examination is also reflected in the preamble to the Title IX final rules. The United States Department of Education wrote that it "believes that in the context of sexual harassment allegations under Title IX, a rule of [nonreliance] on untested statements is more likely to lead to reliable outcomes than a rule of reliance on untested statements. If statements untested by cross-examination may still be considered and relied on, the benefits of cross-examination as a truth-seeking device will largely be lost in the Title IX grievance process." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial

Assistance, 85 Fed. Reg. 30,026, 30,347 (May 19, 2020).

At the time this opinion was written, the Department of Education had proposed amendments to Title IX regulations that would eliminate any cross-examination requirement at postsecondary institutions. See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390, 41,502–41,503 (proposed July 12, 2022). Regardless of how Title IX regulations may be amended, we conclude that, for absolute immunity to apply under Connecticut law, fundamental fairness requires meaningful cross-examination in proceedings like the one at issue.

[31] Specifically, the UWC procedures provide that, "[i]f a party believes the panel should interview witnesses, the party must submit to the [s]ecretary [of the UWC] the names of the witnesses and the subject of their testimony at least four days before the hearing. . . . At its sole discretion, the panel may request the testimony of additional witnesses." There is no indication in the record that the UWC panel called any witnesses other than Doe and Khan.

[32] We note that the record, which lacks a transcript of the hearing, does not indicate whether Khan attempted, but was denied the opportunity, to call witnesses.

[33] If Khan wished to appeal the UWC hearing panel's or Yale College dean's decision, according to the UWC procedures, he could appeal to Yale's provost, but only on two grounds: (1) procedural error preventing a fair adjudication, or (2) new evidence not reasonably available at the time of the hearing. The provost may, in his or her discretion, return the matter to "the hearing panel for reconsideration."

[34] In light of this conclusion, it is unnecessary to address the other criteria discussed in *Priore* and in part II of this opinion.

[35] "[A]bsolute privileges are properly . . . classified as immunities . . . [because] they are based [on] the personal position or status of the actor. . . . [However], over a period of some centuries, these particular immunities always have been called privileges by the courts when they arise in connection with defamation . . . ." (Internal quotation marks omitted.) 2 F. Harper et al., Harper, James and Gray on Torts (3d Ed. 2006) § 5.21, pp. 209–10; see also, e.g., 3 Restatement (Second), Torts §§ 583 through 592A, pp. 240–57 (1977) (discussing absolute privileges). "Privileges of the second class . . . are commonly called conditional or qualified privileges. . . . They are more properly to be classified as privileges, [as] they arise out of the particular occasion [on] which the defamation is published." 2 F. Harper et al., supra, § 5.21, p. 210; see also 8 S. Speiser et al., The American Law of Torts (1991) § 29:87, p. 596 ("this 'privilege' is more properly termed an 'immunity' ").

[36] See, e.g., Conn. Joint Standing Committee Hearings, Higher Education and Employment Advancement, Pt. 3, 2012 Sess., p. 862, testimony of Women's Center of Greater Danbury (identifying fear of reprisal as dominant reason for victims not to report sexual assault); see also, e.g., Bureau of Justice Statistics, Office of Justice Programs, United States Department of Justice, Female Victims of Sexual Violence, 1994–2010 (Rev. May 31, 2016) p. 7, available at https://www.bjs.gov/content/pub/pdf/fvsv9410.pdf (last visited June 21, 2023).

[37] The Clery Act, which is codified at 20 U.S.C. § 1092 (f), was enacted in 1990, after the 1986 rape and murder of Jeanne Clery, a nineteen year old college student. T. Franklin, Note, "*Brown* v. *Delta Tau Delta*: In a Claim of Premises Liability, How Far Should the Law Court Go To Assign a Duty of Care," 68 Me. L. Rev. 363, 369 (2016). The Clery Act requires colleges and universities that participate in federal financial aid programs (known as Title IX schools) to disclose information about crimes occurring on their campuses, as well as to have specific campus safety and security related policies and procedures in place. See id.

[38] Representative Roberta B. Willis, the bill's sponsor, stated that the act "asks our schools, both private and public, to play an active role in preventing [sexual] assaults . . . . [P]reventing sexual assault on college campuses takes a [community-wide] commitment to changing the culture and conditions that allow violence to occur." 55 H.R. Proc., Pt. 13, 2012 Sess., p. 4297.

[39] Anonymous reporting may trigger further investigations and, if a subsequent hearing ensues, require that the victim's identity be disclosed. See General Statutes § 10a-55m (d).

[40] The law defines "affirmative consent" as "an active, clear and voluntary agreement by a person to engage in sexual activity with another person . . . ." General Statutes § 10a-55m (a) (1). Connecticut does not require a covered institution to adopt this statutory definition verbatim, as long as it

uses a definition with a substantially similar meaning. General Statutes § 10a-55m (h).

[41] "[T]he malice required to overcome a qualified privilege in defamation cases is malice in fact or actual malice." *Hopkins* v. *O'Connor*, supra, 282 Conn. 845. "Actual malice requires that the statement, when made, be made with actual knowledge that it was false or with reckless disregard of whether it was false. . . . A negligent misstatement of fact will not suffice; the evidence must demonstrate a purposeful avoidance of the truth. . . . Malice in fact is sufficiently shown by proof that the [statement was] made with improper and unjustifiable motives." (Citation omitted; internal quotation marks omitted.) Id., 846–47; see also *Bleich* v. *Ortiz*, supra, 196 Conn. 504 ("[f]or purposes of our law of defamation, malice is not restricted to hatred, spite or ill will against a plaintiff, but includes any improper or unjustifiable motive").

[42] We note that "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." (Internal quotation marks omitted.) *Kirch* v. *Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006).